**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| JUNE OVADIAS, derivatively on behalf of VERU, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MITCHELL S. STEINER, MICHELE J. GRECO, MARIO A. EISENBERGER, HARRY D. FISCH, GRACE S. HYUN, LUCY LU, and MICHAEL L. RANKOWITZ,<br><br>Defendants,<br><br>and<br><br>VERU, INC.,<br><br>Nominal Defendant. | Case No.: 3:24-cv-00676<br><br>JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff June Ovadias ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Veru, Inc. ("Veru" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Mitchell S. Steiner ("Steiner"), Michele J. Greco ("Greco"), Mario A. Eisenberger ("Eisenberger"), Harry D. Fisch ("Fisch"), Grace S. Hyun ("Hyun"), Lucy Lu ("Lu") and Michael I. Rankowitz ("Rankowitz") (collectively, the "Individual Defendants," and together with Veru, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Veru, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Steiner and Greco for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon

personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Veru, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from March 1, 2021 through March 2, 2023, both dates inclusive (the "Relevant Period").

2. Veru is a Wisconsin corporation headquartered in Miami, Florida. Veru is a composite company comprised of fully owned subsidiaries that ultimately merged in 2016 (the "Merger"). Veru has two main arms: The Female Health Company ("FHC") and Aspen Park Pharmaceuticals, Inc. ("Aspen"). FHC produces and sells internal condoms and other sexual health products. Aspen is a biopharmaceutical company that focuses on oncology, urology, and virology.

3. Following the Merger, the Company began to funnel its revenue from FHC's leading condom product, FC2, towards its research and development pipeline of pharmaceutical products that had been brought in by Aspen.

4. The Individual Defendants caused the Company to attempt to take advantage of the COVID-19 pandemic by beginning development of sabizabulin ("VERU-111"), a drug that had initially been researched for cancer indication, for use in treating COVID-related symptoms.

The intent behind this shift was to receive an Emergency Use Authorization ("EUA") from the U.S. Food and Drug Administration ("FDA"). By obtaining the EUA, the Company would be able to monetize the drug on a shorter timeline than a regular New Drug Application would take, while also lowering the evidentiary standard required for approval of VERU-111.

5. The Relevant Period began on March 1, 2021 when the Company issued a press release titled "Veru Received FDA Agreement to Advance VERU-111 into Phase 3 Study in Hospitalized COVID-19 Patients at High Risk for Acute Respiratory Distress Syndrome (ARDS)" (the "Phase 3 Approval Press Release"). The Phase 3 Approval Press Release announced that the FDA had agreed to the trial design of the Company's VERU-111 trial.

6. This trial began in May 2021, with the Company providing regular updates throughout the Relevant Period. The initial trial group consisted of 300 participants who would be randomly assigned on a two-to-one basis between treatment and placebo arms. However, in March of 2022, the Company ultimately made a "business decision" that reduced the number of patients taking part in the trial by 30%, resulting in a total test pool of 210 subjects. In April of that year, the Company terminated enrollment early upon an interim analysis of 150 subjects. Despite these supposed setbacks, the Company announced that the "FDA agreed that no additional safety data [was] required to support an EUA."

7. The truth began to emerge on November 9, 2022, when an FDA advisory committee met to determine the Company's EUA request. The advisory committee meeting revealed that the FDA had "***highlighted repeatedly*** that the size of the safety database was small," and that the FDA had made "clear to the sponsor, ***a few times***, [it] would expect 500 subjects" in just the treatment group.[1] Additionally, the advisory committee meeting revealed that the FDA

[1] All emphasis added unless otherwise noted.

had "also cautioned against the 2 to 1 randomization ration," as well as the change from 300 to 210 subjects. As a result, the advisory committee voted against issuing VERU-111 an EUA. Ever "No" vote remarked that the Phase 3 trial size was too small, that the committee member would have required a larger trial, and that the FDA's consistent requests to increase the trial size to at least 500 participants influenced their decision.

8. On this news, the price per share of the Company's stock fell $8.04 per share, or approximately 53.6%, from closing at $15.01 per share on November 9, 2022, to close at $6.97 per share on November 10, 2022.

9. The truth fully emerged on March 2, 2023, when Veru announced that the FDA had officially denied the EUA request.

10. On this news, the price per share of the Company's stock fell $1.36 per share, or approximately 36%, from closing at $3.78 per share on March 2, 2023, to close at $2.42 per share on March 3, 2023.

11. During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the FDA had "repeatedly" warned the Company against using a test group smaller than 500 participants for the Phase 3 trial; (2) the FDA also warned against using a 2:1 randomization ratio in the Phase 3 trial; (3) despite these warnings, Veru's Phase 3 trial group consisted of 300 participants in a 2:1 randomization ration; (4) the FDA further advised against the shrinking of the test group to 210 participants; (5) despite

these warnings, the Company shrunk the test group to 210 participants; (6) as a result of failing to heed these warnings and recommendations, VERU-111 was at high risk of not receiving its EUA; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

12. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

13. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14. In light of the Individual Defendants' misconduct—which has subjected the Company, its President, its Chairman of the Board of Directors ("Board"), its Chief Executive Officer ("CEO") its Chief Financial Officer ("CFO"), and its Chief Accounting Officer ("CAO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of Florida (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15. Pursuant to Wisconsin law, before filing this action, Plaintiff made a pre-suit demand on Veru's Board on February 2, 2024, to investigate, remediate, and prosecute the claims alleged herein (the "Litigation Demand"), which have exposed the Company to immense damages. A true and correct copy of the Litigation Demand is attached hereto as Exhibit A.

16. On May 2, 2024, Plaintiff received a brief three paragraph response on behalf of

the Board maintaining that "given the pending underlying issues being litigated in [*Ewing v. Veru Inc. et al*., Case No. 1:22-cv-23960-KMW-LMR (S.D. Fl.)]…the Board will consider your demand once that case has concluded, and will respond appropriately in due course." *See* Exhibit B hereto. Thus, instead of conducting a good faith investigation into the facts and issues raised in the Litigation Demand, interviewing relevant witnesses, undertaking a review of documents, or preparing a report, the Board cursorily refused to respond to the Litigation Demand based on the existence of a related securities class action that overlaps with the some of the facts alleged in the Litigation Demand, and refused to investigate the issues, determining instead to indefinitely delay its responsibilities to consider the Litigation Demand within a reasonable time period. Moreover, the Board waited until the last day of the 90-day period provided under Wis. Stat. § 180.0742 to deliver this message to Plaintiff.

17. After hearing nothing further for more than a month, on June 26, 2024, Plaintiff sent a follow up letter to the Board's counsel, communicating that its response was not truly a response, but rather an attempt to stay its obligations under Wisconsin law. Plaintiff signaled that an indefinite delay, which is what the Board was seeking, could amount to a constructive refusal even though the Board maintained it was neither refusing nor rejecting the Demand in its May 2, 2024 correspondence. Thus, seeking to protect the Company's interests and potential claims, Plaintiff proposed a set of terms that he would be willing to stay the Litigation Demand in favor of, including an agreement by the Board to secure appropriate tolling agreements from the individual identified in the Litigation Demand. Plaintiff requested the Board to respond within a week.

18. On August 7, 2024, having received no further correspondence on the Board's behalf, Plaintiff again reached out to the Board's counsel over email and requested a substantive

response by the end of the week. Counsel for the Board responded the same day with a brief email rejecting any stay or related terms. The Board's unwillingness to consider, investigate and timely respond to the Litigation Demand and to secure appropriate tolling agreements to account for the undue delay sought amounts to an improper rejection of the Litigation Demand and is inconsistent with the Board's obligations under Wisconsin law.

19. Plaintiff's Litigation Demand set forth a credible case that Veru's officers and directors had breached their fiduciary duties to the Company and exposed the Company to claims under Section 10(b) of the Securities and Exchange Act of 1934, among other things. By refusing to consider, investigate, and take appropriate action, the Board acted improperly when it rejected the Litigation Demand, and its determination was thus not a product of exercising good faith business judgment. Such undue delay has exposed the Company to prejudice and for this reason, Plaintiff considers his demand wrongfully refused.

20. Accordingly, Plaintiff now brings this action on behalf of the Company to prevent irreparable harm to the Company.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25. Plaintiff is a current shareholder of Veru. Plaintiff has continuously owned Company common stock since first purchasing the stock on February 23, 2021.

### Nominal Defendant Veru

26. Veru is a Wisconsin corporation with its principal executive offices at 2916 N. Miami Avenue, Suite 1000, Miami, FL 33127. Veru's common stock trades on the Nasdaq Capital Market ("Nasdaq") under the ticker symbol "VERU."

### Defendant Steiner

27. Defendant Steiner has served as Veru's President, CEO, and a member of the Board since 2016. Since 2018, Defendant Steiner has served as Chairman of the Board. Between July 2014 and the Merger in October 2016, Defendant Steiner served as the co-founder, CEO, President, and Vice Chairman of Aspen. According to the revised proxy statement that the Company filed with the SEC on May 9, 2024 (the "2024 Proxy Statement"), as of April 29, 2024, Defendant Steiner owned 9,858,055 shares of the Company's common stock, representing 6.6% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Steiner owned approximately $12.3 million worth of Veru common stock as of that date.

28. For the fiscal year ended September 30, 2021 (the "2021 Fiscal Year")[2], Defendant Steiner received $2,005,067 in total compensation from the Company, which consisted of $618,000 in salary, $578,772 in option awards, $790,298 in nonequity incentive plan compensation and $17,997 in all other compensation. For the 2022 Fiscal Year, Defendant Steiner received $6,096,281 in total compensation from the Company, which consisted of $760,735 in salary, $15,000 in bonus, $4,576,284 in option awards, $725,962 in nonequity incentive plan compensation and $18,300 in all other compensation. For the 2023 Fiscal Year, Defendant Steiner received $4,714,041 in total compensation from the Company, which consisted of $865,524 in salary, $3,828,717 in option awards, and $19,800 in all other compensation.

29. The 2024 Proxy Statement stated the following about Defendant Steiner:

> Mitchell S. Steiner, M.D., F.A.C.S. has served as President and Chief Executive Officer of the Company and as a director of the Company since October 2016 and as Chairman of the Board since March 2018. Dr. Steiner was the co-founder of Aspen Park Pharmaceuticals, Inc. ("Aspen Park"), and served as Aspen Park's Chief Executive Officer, President and Vice Chairman of the Board from July 2014 to October 2016. From 2014 to 2016, Dr. Steiner was a consultant and then the President, Urology and member of senior management of OPKO Health, Inc. (NASDAQ:OPK) and had responsibilities for the launch, marketing, sales and reimbursement of 4Kscore prostate cancer test to urologists and primary care physicians. Dr. Steiner was also the co-founder of GTx, Inc., a men's health and oncology public company, where he served as Chief Executive Officer and Vice Chairman of Board of Directors from 1997 to 2014. Dr. Steiner is a Board Certified Urologist and a Fellow of the American College of Surgeons and has held numerous academic appointments, including Assistant Professor of Urology, Cell Biology, and Pathology at Vanderbilt School of Medicine from 1993 to 1995 and Chairman and Professor of Urology, Director of Urologic Oncology and Research and the Chair of Excellence in Urologic Oncology at the University of Tennessee from 1995 to 2004. Dr. Steiner holds a B.A. in Molecular Biology and Chemistry from Vanderbilt University and an M.D. from the University of Tennessee. He performed his surgical and urologic training at The Johns Hopkins Hospital and postdoctoral research fellow in cell biology at Vanderbilt School of Medicine.

[2] Veru's fiscal year does not mirror the calendar year but rather begins on October 1st and concludes on September 30th of each year.
For the period between October 1, 2021 to September 30, 2022 (the "2022 Fiscal Year").
For the period between October 1, 2022 to September 30, 2023 (the "2023 Fiscal Year").

Director Qualifications

Dr. Steiner's medical background and extensive leadership and management experience, including strategic planning, marketing, new product development, market research, operations, corporate communication, corporate transactions, as well as a deep knowledge of the Company's industry, business and strategic evolution and his experience as the President, Chief Executive Officer and co-founder of Aspen Park, all led to the conclusion that he should serve as a director and Chairman, President and Chief Executive Officer of the Company.

**Defendant Greco**

30. Defendant Greco has served as Veru's CAO since December 2017, and as joint CAO, CFO since March 2018. Defendant Greco previously served as Veru's Executive Vice President ("EVP") of Finance from October 2016 until March 2018. Prior to the Merger, Defendant Greco served as Vice President and CFO of FHC from January 2013 until December 2014, and then EVP and CFO of FHC from December 2014 until the Merger in October 2016. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Greco owned 1,261,307 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Greco owned approximately $1.6 million worth of Veru common stock as of that date.

31. For the 2021 Fiscal Year, Defendant Greco received $835,668 in total compensation from the Company, which consisted of $382,500 in salary, $176,043 in option awards, $263,790 in nonequity incentive plan compensation and $13,335 in all other compensation. For the 2022 Fiscal Year, Defendant Greco received $2,254,795 in total compensation from the Company, which consisted of $445,833 in salary, $5,000 in bonus, $1,572,438 in option awards, $213,224 in nonequity incentive plan compensation and $18,300 in all other compensation. For the 2023 Fiscal Year, Defendant Greco received $1,545,146 in total compensation from the Company, which consisted of $473,903 in salary, $1,051,443 in option awards, and $19,800 in all other compensation.

32. The 2024 Proxy Statement stated the following about Defendant Greco:

> Ms. Greco has served as Chief Financial Officer of the Company since March 2018 and as Chief Administrative Officer of the Company since December 2017. Ms. Greco served as Executive Vice President of Finance of the Company from October 2016 to March 2018, as Executive Vice President and Chief Financial Officer of the Company from December 2014 to October 2016 and as Vice President and Chief Financial Officer of the Company from January 2013 to December 2014. Ms. Greco is a CPA with nearly 30 years of experience in public accounting with Ernst & Young LLP. From January 2011 to February 2012, Ms. Greco provided consulting services to Systems Research Incorporated as a recruiter of finance professionals. From March 2009 to January 2011, Ms. Greco was involved in a series of personal business ventures. From 1994 to March 2009, Ms. Greco served as an audit partner with Ernst & Young LLP. Ms. Greco joined Ernst & Young LLP in 1981.

**Defendant Eisenberger**

33. Defendant Eisenberger has served as a director of Veru since October 2016. He also currently serves as the Chair of the Nominating & Governance Committee, and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Eisenberger owned 260,001 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Eisenberger owned approximately $325,001 worth of Veru common stock as of that date.

34. For the 2021 Fiscal Year, Defendant Eisenberger received $112,539 in total compensation from the Company, which consisted of $112,539 in option awards. For the 2022 Fiscal Year, Defendant Eisenberger received $391,748 in total compensation from the Company, which consisted of $391,748 in option awards. For the 2023 Fiscal Year, Defendant Eisenberger received $795,570 in total compensation from the Company, which consisted of $795,570 in option awards.

35. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Eisenberger made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| August 15, 2022 | 100,000 | $20.04 | $2,003,600 |

Thus, in total, before the fraud was exposed, he sold 100,000 shares of Company common stock on inside information, for which he received approximately $2.0 million in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

36. The 2024 Proxy Statement stated the following about Defendant Eisenberger:

> Mario Eisenberger, M.D. has served as a director of the Company since October 2016. Dr. Eisenberger currently is the Dale Hughes Professor of Oncology at The Johns Hopkins University and has been in the full-time faculty since 1993. From 2010 to 2014, Dr. Eisenberger founded Oncology Trials Insights, Inc., a privately held clinical trials management company. Since 2010, Dr. Eisenberger has also served as an ad-hoc member of the Oncologic Drugs Advisory Committee of the FDA. Since 1988, he has served in advisory, strategic and data safety monitoring boards, including Bristol-Myers Squibb, Sanofi, Astellas, Schering Plough, Auguron, AKZO, Dupont, Rhone-Poulenc Rorer, Aventis, Jansen, Ipsen, Active Biotech, Medivation, Tokai, Xanthus, Cytogen, Ortho Biotech, Merck-Sharp and Dohme, Tyme, Inc., Ferring and Bayer. From 1984 to 1998, Dr. Eisenberger held the position of head of the advanced prostate cancer committee and vice chair of the genitourinary cancer of the Southwest Oncology Group. From 1984 to 1993, he served as Professor of Oncology at The University of Maryland. From 1984 to 1989, he was the Chief of Oncology at the Baltimore VAH. From 1982 to 1984, he was a Senior Investigator at the Cancer Therapy Evaluation Program of the National Institute in charge of coordinating extramural clinical research in urological cancers. From 1976 to 1982, he served in the faculty of the University of Miami. Dr. Eisenberger obtained his M.D. at the Federal University of Rio de Janeiro Brazil in 1972 and is board certified in Internal Medicine and Medical Oncology.
>
> Director Qualifications

Dr. Eisenberger's medical background and broad business experience in the pharmaceutical industry led to the conclusion that he should serve as a director of the Company.

**Defendant Fisch**

37. Defendant Fisch has served as a Company director since 2016, as Chief Corporate Officer since January 2018, and as Vice Chairman since March 2018. Between July 2014 and the Merger in October 2016, Defendant Fisch served as the co-founder, Chairman of Aspen's Board. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Fisch owned 8,992,320 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Fisch owned approximately $11.2 million worth of Veru common stock as of that date.

38. For the 2021 Fiscal Year, Defendant Fisch received $816,927 in total compensation from the Company, which consisted of $168,809 in option awards and $648,118 in all other compensation. For the 2022 Fiscal Year, Defendant Fisch received $3,161,971 in total compensation from the Company, which consisted of $467,362 in salary, $15,000 in bonus, $2,453,160 in option awards, and $226,449 in nonequity incentive plan compensation. Defendant Fisch continued to receive handsome compensation for his role as Chief Corporate Officer for the 2023 Fiscal Year.

39. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fisch made the following sale of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 16, 2021 | 100,000 | $8.35 | $835,300 |

Thus, in total, before the fraud was exposed, he sold 100,000 shares of Company common stock on inside information, for which he received approximately $835,300 in proceeds. His insider sale,

made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

40. The 2024 Proxy Statement stated the following about Defendant Fisch:

> Harry Fisch, M.D., F.A.C.S. has served as a director of the Company since October 2016, as Vice Chairman of the Board since March 2018 and as Chief Corporate Officer of the Company since January 2018. Dr. Fisch was the co-founder of Aspen Park and served as the Chairman of the Board and Chief Scientific Officer of Aspen Park from July 2014 to October 2016. Since 1994, Dr. Fisch has served as the Chief Executive Officer and President of Millennium Sciences, Inc. Dr. Fisch has also had numerous academic and clinical appointments including Clinical Professor of Urology and Reproductive Medicine at Weill College of Medicine, Cornell University from 2009 to 2022, Director of the Male Reproductive Center at Albert Einstein College of Medicine/Montefiore Medical Center from 1998 to 1999 and Professor of Clinical Urology at Columbia University, College of Physicians and Surgeons from 1999 to 2009. Dr. Fisch is a Board Certified Urologist and a Fellow of the American College of Surgeons. Dr. Fisch holds a B.A. in Chemistry from the State University of New York at Binghamton, an M.D. from Mount Sinai School of Medicine, New York, and performed his surgical and urologic training at Albert Einstein College of Medicine/Montefiore Medical Center.
>
> Director Qualifications
>
> Dr. Fisch's medical background, experience in the pharmaceutical industry and deep understanding of the Company's industry, business and strategic evolution, as well as his experience as the Chairman of the Board, Chief Scientific Officer and a co-founder of Aspen Park, all led to the conclusion that he should serve as a director of the Company.

**<u>Defendant Hyun</u>**

41. Defendant Hyun has served as a Company director since August 2020. She also serves as a member of the Nominating & Governance Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Hyun owned 143,125 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Hyun owned approximately $178,906 worth of Veru common stock as of that date.

42. For the 2021 Fiscal Year, Defendant Hyun received $124,238 in total

compensation from the Company, which consisted of $124,238 in option awards. For the 2022 Fiscal Year, Defendant Hyun received $325,268 in total compensation from the Company, which consisted of $325,268 in option awards. For the 2023 Fiscal Year, Defendant Hyun received $755,390 in total compensation from the Company, which consisted of $755,390 in option awards.

43. The 2024 Proxy Statement stated the following about Defendant Hyun:

> Grace Hyun, M.D., has served as a director of the Company since August 2020. Ms. Hyun has served as a Director of Pediatric Urology at NYU Langone Hospital-Brooklyn and a Clinical Associate Professor at NYU Langone School of Medicine since 2017. From 2011 to 2017, Ms. Hyun served as an Associate Director of Pediatric Urology at The Mount Sinai Medical Center and as an Assistant Professor at The Mount Sinai School of Medicine. She has served as a board member to the New York Section of the American Urological Association, the New York Academy of Medicine and the Societies of Pediatric Urology. She received her M.D. from Cornell University Medical School and has a B.A. in History from Columbia University.
>
> Director Qualifications
>
> Dr. Hyun's medical background and deep understanding of the Company's industry led to the conclusion that she should serve as a director of the Company.

**<u>Defendant Lu</u>**

44. Defendant Lu has served as a Company director since May 2021. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Lu owned 159,801 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Lu owned approximately $199,751 worth of Veru common stock as of that date.

45. For the 2021 Fiscal Year, Defendant Lu received $357,126 in total compensation from the Company, which consisted of $357,126 in option awards. For the 2022 Fiscal Year, Defendant Lu received $391,748 in total compensation from the Company, which consisted of

$391,748 in option awards. For the 2023 Fiscal Year, Defendant Hyun received $835,750 in total compensation from the Company, which consisted of $835,750 in option awards.

46. The 2024 Proxy Statement stated the following about Defendant Lu:

> Lucy Lu, M.D. has served as a director of the Company since May 2021 and previously from October 2016 to March 2019. Since April 2022, Dr. Lu has served as Chief Operations Officer of Innovative Cellular Therapeutics, Inc., a company focused on developing cell therapy for solid tumors. Since November 2022, Dr. Lu has served as a director of Inventiva S.A., a clinical stage biopharmaceutical company. From February 2015 to March 2022, Dr. Lu was President, Chief Executive Officer and a director of Avenue Therapeutics, Inc., a company focused on pharmaceutical therapies used in the acute care setting. From February 2012 to June 2017, Dr. Lu was the Executive Vice President and Chief Financial Officer of Fortress Biotech, Inc. Since December 2022, Dr. Lu has served as a director of Fortress Biotech, Inc. Prior to working in the biotech industry, Dr. Lu had 10 years of experience in healthcare-related equity research and investment banking. From February 2007 to January 2012, Dr. Lu was a senior biotechnology equity analyst with Citigroup Investment Research. From 2004 until joining Citigroup, she was with First Albany Capital, serving as Vice President from April 2004 until becoming a Principal of First Albany Capital in February 2006. Dr. Lu obtained her M.D. from the New York University School of Medicine and her M.B.A. from the Leonard N. Stern School of Business at New York University. Dr. Lu obtained a B.A. from the University of Tennessee's College of Arts and Science.
>
> Director Qualifications
>
> Dr. Lu's extensive experience in leadership positions in the pharmaceutical and medical products industries and her knowledge of the Company from her previous service as a director led to the conclusion that she should serve as a director of the Company.

**Defendant Rankowitz**

47. Defendant Rankowitz has served as a Company director since March 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and Nominating & Governance Committee. According to the 2024 Proxy Statement, as of April 29, 2024, Defendant Rankowitz owned 415,001 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 29, 2024 was $1.25, Defendant Rankowitz owned approximately $518,751 worth of Veru common stock as

of that date.

48. For the 2021 Fiscal Year, Defendant Rankowitz received $112,539 in total compensation from the Company, which consisted of $112,539 in option awards. For the 2022 Fiscal Year, Defendant Rankowitz received $391,748 in total compensation from the Company, which consisted of $391,748 in option awards. For the 2023 Fiscal Year, Defendant Rankowitz received $835,930 in total compensation from the Company, which consisted of $835,930 in option awards.

49. The 2024 Proxy Statement stated the following about Defendant Rankowitz:

> Michael L. Rankowitz has served as a director of the Company since March 2018. Mr. Rankowitz has served as a Senior Advisor at Morgan Stanley since 2001. From 1980 to 2001, Mr. Rankowitz was employed at Morgan Stanely, most recently from 1992 to 2001 as a managing director, where he also served as a co-head of Global High Yield and was responsible for risk management, research and sales for high yield, emerging markets, bank debt and distressed securities. Mr. Rankowitz has held directorships with NF Investment Corp., Carlyle Funds, 1st Tee of Metropolitan New York, Discover Card, Clarent Hospital Corp., New York Racing Authority, International Dyslexia Association - New York Branch, Trinity School (New York) and Browning School (New York). He has a B.S. in Mathematics from the University of Vermont.
>
> Director Qualifications
>
> Mr. Rankowitz's extensive experience in investment banking, particularly in corporate finance transactions and risk management, led to the conclusion that he should serve as a director of the Company.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50. By reason of their positions as officers, directors, and/or fiduciaries of Veru and because of their ability to control the business and corporate affairs of Veru, the Individual Defendants owed Veru and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Veru in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Veru and its shareholders so as to benefit all shareholders

equally.

51. Each director and officer of the Company owes to Veru and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Veru, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53. To discharge their duties, the officers and directors of Veru were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Veru, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Veru's Board at all relevant times.

55. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the

Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56. To discharge their duties, the officers and directors of Veru were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Veru were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Wisconsin, Florida, and the United States, and pursuant to Veru's own code of business ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Veru conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business

and internal affairs of Veru and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Veru's operations would comply with all applicable laws and Veru's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57. Each of the Individual Defendants further owed to Veru and the shareholders the duty of loyalty requiring that each favor Veru's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

58. At all times relevant hereto, the Individual Defendants were the agents of each other and of Veru and were at all times acting within the course and scope of such agency.

59. Because of their advisory, executive, managerial, directorial, and controlling positions with Veru, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

60. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Veru.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and

individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Veru was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Veru and was at all times acting within the course and scope of such agency.

## VERU'S CODE OF ETHICS

***Code of Ethics***

66. Veru's Code of Ethics applies to "all employees of VERU and its subsidiaries," including "VERU's directors (who are treated as "employees" for purposes of this Code)." The purpose of the Code of Ethics is to "maintain [Veru's] reputation for integrity and honesty, and for acting in good faith in all of its dealings."

67. In a section titled "General Guidelines for Ethical Behavior," the Code of Ethics states:

> The following general ethical principles apply to all VERU employees:
>
> - Employees must always conduct all aspects of VERU's business in an ethical and legal manner.

- All employees should actively promote honest and ethical behavior both within and outside of VERU.

- Any employee in a supervisory role is responsible for the conduct of employees reporting to him or her.

- The conduct of each employee with customers, distributors, the general public, the media and other employees must reflect the highest standards of honesty, integrity and fairness.

- Employees must always cooperate fully in any investigation of misconduct.

68. In a section titled "Conflicts of Interest must be Avoided," the Code of Ethics states:

> Your conduct in the performance of your duties for VERU must be honest and ethical, including the ethical handling of actual or apparent conflicts of interest between personal and professional interests. You may not engage in any act that might result in a conflict (or even the appearance of a conflict) between VERU's interest and your own or another person's or organization's interests. You should also be free from any interest or influence that would make it difficult to give VERU your best efforts and undivided attention. For example, there may be a conflict of interest if you:
>
> - Cause VERU to engage in a business transaction with your relatives or friends;
>
> - Use non-public VERU, customer or supplier information for personal gain by you, relatives or friends (including securities transactions based on such information);
>
> - Have more than a modest financial interest in VERU's vendors, customers or competitors; or
>
> - Compete or prepare to compete with VERU while still employed by VERU.
>
> Because it is impossible to describe every potential conflict, VERU necessarily relies on your commitment to exercise sound judgment, to seek advice when appropriate and to adhere to the highest ethical standards in the conduct of your professional and personal affairs. If you have concerns or questions about any situation, follow the steps outlined under the heading "Reporting Violations" below.

69. In a section titled "Business Opportunities belong to VERU," the Code of Ethics

states:

> You should not take advantage or allow others to take advantage of any business opportunity which VERU has (or can reasonably be expected to have) an interest. Business opportunities of VERU include any opportunity discovered through the use of VERU property, information or position.

70. In a section titled "Ownership of Outside Organizations is Restricted," the Code of Ethics states:

> You may not own (directly or indirectly) any interest in an outside organization or serve as a director of that organization, if it competes in any way with VERU or has (or is likely to have) dealings with VERU. However, you may own up to 1% of the shares of any public corporation regardless of its business dealings or competitive relationship with VERU.

71. In a section titled "VERU's Confidential Information must be Protected, the Code of Ethics states:

> You are responsible for protecting and keeping strictly confidential VERU's business plans, financial documents, customer information, technology and other trade secrets or proprietary information. Do not communicate this information to outsiders unless you have been authorized to do so, and do not share this information with other employees except on a "need-to-know" basis. You should also follow any specific confidentiality procedures that may be issued from time-to-time. Using confidential information for your personal benefit or in any way not directly related to your duties as a VERU employee is prohibited. Your obligation to keep this kind of information confidential continues even if you leave VERU. No employee may communicate with the media, stock brokers, stock analysts or stockholders on any matter relating to VERU without the express prior approval of VERU's President & Chief Executive Officer.

72. In a section titled "Trading in VERU Stock by Employees," the Code of Ethics states:

> Material nonpublic information is nonpublic information about VERU that a reasonable investor would consider important in making a decision to buy, sell or hold VERU stock. This includes, for example, nonpublic information on earnings, significant gains or losses of business, tender offers, or significant acquisition or divestiture negotiations.
>
> All of VERU's employees are subject to VERU's Insider Trading Policy. Disclosing material nonpublic information, trading in VERU securities while in possession of

> material nonpublic information or otherwise acting on such information, or recommending others to act based on the information violates VERU's Insider Trading Policy and federal and state securities laws.

73. In a section titled "Receipt and Use of Trade Secret and Confidential Information of Others is Restricted," the Code of Ethics states:

> You may receive and use trade secrets and other confidential information from an outsider only on the basis of a written understanding that has been reached with the outsider that the information need not be treated as confidential or as otherwise specified in a written understanding approved by VERU's Executive Vice President–Legal. You should also keep confidential the trade secrets and confidential information of your former employer.

74. In a section titled "Full and Accurate Disclosure in SEC Reports," the Code of Ethics states:

> VERU's principal executive officer, principal financial officer, principal accounting officer or controller or persons performing similar functions (VERU's "SEC reporting officers") are responsible to promote and oversee systems and procedures reasonably designed to facilitate VERU's ability to provide full, fair, accurate, timely and understandable disclosure in reports and documents that VERU files with, or submits to, the SEC and in other public communications made by VERU. All other VERU officers, VERU directors and other VERU employees involved directly or indirectly in the preparation of such SEC reports or other public communications are responsible for assisting VERU's SEC reporting officers in providing full, fair, accurate, timely and understandable disclosure. All such persons must exercise the highest standards of care in preparing such SEC reports or other public communications in accordance with the following guidelines:
>
> - All VERU accounting records, as well as reports produced from those records, must be in accordance with the laws of each applicable jurisdiction.
> - All records must fairly and accurately reflect the transactions or occurrences to which they relate.
> - All records must fairly and accurately reflect, in reasonable detail, VERU's assets, liabilities, revenues and expenses.
> - VERU's accounting records must not contain any false or intentionally misleading entries.
> - No transactions should be intentionally misclassified as to accounts, departments or accounting periods.

- All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.

- No information should be concealed from the independent auditors.

- Compliance with VERU's system of internal accounting controls is required.

75. In a section titled "Improper Influence on Audits is Prohibited," the Code of Ethics states:

> You may not take or facilitate any action to fraudulently influence, coerce, manipulate or mislead VERU's independent auditors for the purpose of rendering VERU's financial statements materially misleading.

76. In a section titled "VERU Records must be Properly Maintained," the Code of Ethics states:

> You must always record information accurately, honestly and in accordance with all relevant accounting, recordkeeping and document retention standards. No employee is ever authorized to knowingly enter or maintain false or misleading information in corporate books, records or reports. Also, no circumstances justify keeping "off-the-books" accounts in any form, particularly accounts established to facilitate or disguise questionable or illegal payments.
>
> Employees in possession of corporate records are responsible for the use and safekeeping of such records and must take all prudent measures to safeguard the privacy of employees and other individuals with respect to personal information contained in such records.
>
> VERU business records must be maintained for the periods specified in any document retention policy of VERU in effect. Records may be destroyed only at the expiration of the pertinent period. In no case may documents involved in a pending or threatened litigation, government inquiry or under subpoena or other information request be discarded or destroyed, regardless of the periods specified in any document retention policy of VERU in effect. In addition, you may never destroy, alter or conceal, with an improper purpose, any record or otherwise impede any official proceeding, either personally, in conjunction with, or by attempting to influence, another person.
>
> You must use common sense and observe standards of good taste regarding the content when creating business records and other documents (such as e-mail) that

> may be retained by VERU or a third party. You should keep in mind that at a future date, VERU or a third party may be in a position to rely on or interpret the document with the benefit of hindsight and/or the disadvantage of imperfect recollections.
>
> You are required to cooperate fully with appropriately authorized internal or external investigations. Making false statements to or otherwise misleading internal or external auditors, corporate counsel, VERU representatives or regulators can be a criminal act that can result in severe penalties. You should never withhold or fail to communicate information that raises ethical questions and thus should be brought to the attention of higher levels of management.

77. In a section titled "You must comply with Applicable Laws and Regulations," the Code of Ethics states:

> You must comply with all applicable laws and regulations in the countries in which VERU operates, including insider trading laws, antitrust and fair competition laws, import and export laws and the FCPA. If you have any questions concerning the application or interpretation of laws and regulations that may relate to your business activities, consult VERU's General Counsel. You are encouraged to report any known or suspected criminal activity of any nature, or any dishonest or fraudulent act, which may affect VERU, its officers, directors, employees, suppliers or customers to the appropriate person as provided under "Reporting Violations" below.
>
> VERU prohibits sexual or any other kind of harassment or intimidation. If you believe that you are being subjected to harassing behavior, or if you observe or receive a complaint regarding such behavior, you should report it to the appropriate person as provided under "Reporting Violations" below.

78. In a section titled "You must Immediately Report Any Fraud," the Code of Ethics states:

> All employees must immediately report any fraud committed by management or others who have a significant role in internal accounting controls or the preparation of VERU's financial statements.

79. In a section titled "Waivers," the Code of Ethics states:

> The Board of Directors will have final responsibility for the interpretation and administration of this Code. Only the Board of Directors (or a committee of the Board) may grant waivers of any of the provisions of this Code, and any such waivers will promptly be disclosed in an SEC filing as required by SEC and other applicable rules and regulations. A determination by the Board of Directors (or an authorized committee of the Board) that a particular matter does not violate the

provisions of this Code shall not be construed as a waiver of this Code.

***Corporate Governance Guidelines***

80. Veru's Corporate Governance Guidelines are intended "to assist the Board in the exercise of its responsibilities."

81. In a section titled "Board of Directors' Responsibilities," the Corporate Governance Guidelines state:

> Each director is expected to discharge his or her director duties, including duties as a member of any committee on which the directors serves, in good faith and in a manner the director reasonably believes to be in the best interests of the Company. Consistent with the importance of the Board's responsibilities, each director is expected to be familiar with the Company's business and public disclosures, to review in advance of Board meetings all related materials distributed to the Board and to attend and participate in meetings of the Board and meetings of any committee of which such director is a member.

82. Under the same heading, in a subsection titled "Selection, Evaluation and Retention of Chief Executive Officer and Oversight of Selection and Performance of Other Executive Officers," the Corporate Governance Guidelines state:

> The Board, with assistance from the Compensation Committee, has the responsibility to select, evaluate the performance of and make decisions about the retention of the Chief Executive Officer, to oversee the selection and evaluation of the performance of other executive officers, to plan for management succession, and to monitor on a regular basis the effectiveness and execution of management strategies and decisions in optimizing the Company's long-term financial returns in a manner consistent with applicable legal requirements and ethical considerations.

83. Under the same heading, in a subsection titled "Understanding, Reviewing and Monitoring Implementation of Strategic Plans and Annual Operating Plans and Budgets," the Corporate Governance Guidelines state:

> The Board is responsible for overseeing and understanding the Company's strategic plans from inception through development and execution and should regularly monitor implementation of such plans to determine whether they are being implemented effectively and whether any changes are needed. The Board also is responsible for overseeing and understanding the Company's annual operating

> plans and annual budgets and for monitoring whether these plans are being implemented effectively and within budgetary limits.

84. Under the same heading, in a subsection titled "Selection and Oversight of Independent Auditors; Oversight of Financial Statements," the Corporate Governance Guidelines state:

> The Audit Committee of the Board has sole responsibility to appoint, compensate and replace the Company's independent accounting firm that audits the Company's financial statements and to pre-approve the engagement terms and the provision of any audit and non-audit services performed by such accounting firm for the Company. The Audit Committee will have direct responsibility for monitoring the performance of such accounting firm and guarding against any compromise of its independence, as well as overseeing the financial statements prepared by management, with the goal of assuring that they fairly present the Company's financial condition, results of operations, cash flows and related risks in a clear and understandable way.

85. Under the same heading, in a subsection titled "Advising Management on Significant Issues," the Corporate Governance Guidelines state:

> The Board is responsible for utilizing the broad range of experiences and perspectives of directors to advise and counsel management, both in meetings and in informal consultations, on significant issues facing the Company.

86. Under the same heading, in a subsection titled "Review and Approval of Significant Company Actions and Certain Other Matters," the Corporate Governance Guidelines state:

> The Board is responsible under state corporate law to review and approve significant actions by the Company, including election of executive officers and major transactions. In addition, the Board is responsible for approving certain actions by the Company as set forth in these Guidelines and any other Company policies that may be adopted from time to time by the Board, or as otherwise required by any applicable national securities exchange or national securities association on which the Company's securities are traded.

87. Under the same heading, in a subsection titled "Nominating Directors and Committee Members and Overseeing Effective Corporate Governance," the Corporate

Governance Guidelines state:

> The Board and the Nominating and Corporate Governance Committee are responsible for (a) evaluating and nominating directors and members of Board committees, (b) overseeing the structure and practices of the Board and the committees and (c) overseeing other corporate governance matters, as more fully set forth in these Guidelines and the charter of the Nominating and Corporate Governance Committee.

88. Under the same heading, in a subsection titled "Risk Oversight, the Corporate Governance Guidelines state:

> The Board should understand the principal risks associated with the Company's business on an ongoing basis and it is the responsibility of management to assure that the Board and its committees are kept well informed of these changing risks on a timely basis. It is important that the Board oversee the key risk decisions of management, which includes comprehending the appropriate balance between risks and rewards. The Board may delegate risk oversight responsibility to any appropriate committee through its charter or otherwise.

89. In a section titled "Management's Responsibilities," the Corporate Governance Guidelines state:

> Management is responsible for operating the Company in an effective, ethical and legal manner designed to produce value for the Company's shareholders consistent with the Company's policies and standards, including these Guidelines. Management also is responsible for enforcing and complying with mandatory provisions of the Company's policies and standards. Senior management is responsible for understanding the Company's business activities and the material risks being incurred by the Company and also is responsible for avoiding conflicts of interest with the Company and its shareholders.

90. Under the same heading, in a subsection titled "Financial Statements and Disclosures," the Corporate Governance Guidelines state:

> Management is responsible for producing, under the oversight of the Board and the Audit Committee, financial statements that fairly present the Company's financial condition, results of operations, cash flows and related risks in a clear and understandable way, for making timely and complete disclosures to investors, and for keeping the Board and the appropriate committees of the Board well-informed on a timely basis as to all matters of significance to the Company.

91. Under the same heading, in a subsection titled "Strategic Planning," the Corporate

Governance Guidelines state:

> The Chief Executive Officer and senior management are responsible for developing and presenting to the Board the Company's strategic plans and for implementing those plans as approved by the Board.

92. Under the same heading, in a subsection titled "Internal Control Over Financial Reporting," the Corporate Governance Guidelines state:

> Senior management is responsible for developing, implementing and monitoring an effective system of internal control over financial reporting to provide reasonable assurance that: the Company's transactions are properly authorized; the Company's assets are safeguarded against unauthorized or improper use; and the Company's transactions are properly recorded and reported. Such internal control over financial reporting also shall be designed to permit preparation of financial statements for the Company in conformity with generally accepted accounting principles or any other criteria applicable to such statements.

93. Under the same heading, in a subsection titled "Disclosure Controls and Procedures," the Corporate Governance Guidelines state:

> Senior management is also responsible for establishing, maintaining and evaluating the Company's "disclosure controls and procedures." The term "disclosure controls and procedures" means controls and other procedures of the Company that are designed to ensure that information required to be disclosed by the Company in the reports filed by it under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. "Disclosure controls and procedures" include, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in the reports it files under the Securities Exchange Act of 1934 is accumulated and communicated to the Company's management, including its principal executive and financial officers, to allow timely decisions regarding required disclosure.

94. In violation of the Code of Ethics and Corporate Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust

enrichment, and the aiding and abetting thereof. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

**VERU'S AUDIT COMMITTEE CHARTER**

95. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is to, *inter alia*:

> The Audit Committee is appointed by the Board of Directors to monitor the corporate financial reporting and the internal and external audits of Veru Inc. (the "Company"). The Audit Committee is directly responsible for the appointment, compensation and oversight of the work of the Company's independent auditors, including the resolution of disagreements between management and the auditor regarding financial reporting. The Audit Committee shall assist the Board of Directors with oversight of (i) the integrity of the Company's financial statements, the accounting and financial reporting process of the Company and the audits of the financial statements of the Company; (ii) the effectiveness of the Company's internal control over financial reporting; (iii) the Company's compliance with legal and regulatory requirements; (iv) the independent auditor's qualifications and independence and (v) the performance of the Company's internal audit function and independent auditors.
>
> * * *
>
> The function of the Audit Committee is oversight. The management of the Company is responsible for the preparation, presentation and integrity of the Company's financial statements. Management is responsible for maintaining appropriate accounting and financial reporting principles and policies and internal controls and procedures designed to assure compliance with accounting standards and applicable laws and regulations. The independent auditors are responsible for planning and carrying out a proper audit and reviews, including reviews of the Company's quarterly financial statements prior to the filing of each quarterly report on Form 10Q, and other procedures. In fulfilling their responsibilities under this charter, it is recognized that members of the Audit Committee are not full-time employees of the Company and are not, and do not represent themselves to be, accountants or auditors by profession. As such, it is not the duty or responsibility

of the Audit Committee or its members to conduct auditing or accounting reviews or procedures, and each member of the Audit Committee shall be entitled to rely on (a) the integrity of those persons and organizations within and outside the Company from whom it receives information and (b) the accuracy of the financial and other information provided to the Audit Committee by such persons or organizations.

96. According to the Audit Committee Charter, the responsibilities of the Audit Committee are, *inter alia*:

1. Reviewing on a continuing basis the adequacy of the Company's system of internal control over financial reporting and the Company's disclosure controls and procedures, and discussing with management, management's process for assessing the effectiveness of internal control over financial reporting under Section 404 of the Sarbanes-Oxley Act, including any material weaknesses or significant deficiencies identified;

2. Reviewing on a continuing basis the activities, organizational structure and qualifications of the Company's internal audit function;

3. Reviewing the independent auditors' proposed audit scope and approach, including, when applicable, audit procedures with respect to the Company's internal control over financial reporting;

4. Reviewing with management and the independent auditors the audited financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors and any serious difficulties or disputes with management encountered during the course of the audit, and reviewing the other financial disclosures in the Company's Form 10-K report, including Management's Discussion and Analysis of Financial Condition and Results of Operations;

5. Reviewing management's report on its assessment of the effectiveness of internal control over financial reporting as of the end of each fiscal year and the independent auditor's report on the effectiveness of internal control over financial reporting, discussing with the independent auditor the characterization of deficiencies in internal control over financial reporting, and, if applicable, discussing, with management, management's remediation plan to address internal control deficiencies;

6. Reviewing with management and the independent auditors the unaudited quarterly financial statements, and reviewing the other financial disclosures in the Company's Form 10-Q report, including Management's Discussion and Analysis of Financial Condition and Results of Operations, and reviewing with the independent auditors any significant or material issues

identified through procedures followed for interim quarterly financial statements, in each case after the end of each of the first three quarters of the fiscal year;

7. Approving the appointment of the independent auditors, subject, if applicable, to stockholder ratification;

* * *

9. Reviewing the performance and qualifications of the independent auditors and reviewing the experience and qualifications of the senior members of the independent auditor team, compliance by the independent auditors with audit partner rotation requirements and the quality control procedures of the independent auditors;

10. Approving in advance the retention of the independent auditor firm for any nonaudit service that such firm is not prohibited from performing for the Company and approving the fees for any such service;

* * *

14. Advising the Board of Directors with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations;

15. Reviewing with management and the independent auditors the effect of any significant regulatory and accounting initiatives;

* * *

18. Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

19. Providing oversight and review of the Company's asset management policies, including an annual review of the Company's investment policies and performance for cash and short-term investments, and the Company's risk assessment and risk management policies;

* * *

22. Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and for the confidential, anonymous submission by employees of the Company or its subsidiaries of concerns regarding questionable accounting or auditing matters;

23. Performing other oversight functions as requested by the full Board of Directors;

24. Reviewing and updating the Audit Committee's charter annually and recommending any proposed changes to the Board of Directors for approval;

25. Instructing the independent accountants that the independent accountants are ultimately responsible to the Board of Directors and the Audit Committee; and

26. Preparing any report, including any report of the Audit Committee required by the rules of the Securities and Exchange Commission to be included in the proxy statement for the Company's annual meeting.

97. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, and waste of corporate assets. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### I. Veru's History, Shift to Research & Development, and Financial Condition Prior to the Relevant Period

#### A. Background

98. Prior to the Merger, Veru operated as FHC, which produced and sold one product: a female condom (i.e. an internal condom). The female condom produced by FHC was utilized to prevent pregnancy and sexually transmitted infections. The female condom sold on the market by FHC at the time was a second-generation product that went by "FC2." Since receiving FDA approval in 2009, the FC2 accounted for almost the entirety of FHC's (and subsequently Veru's)

revenue.

99. On October 31, 2016, the Merger occurred when FHC acquired Alpine for approximately $41.1 million in stock. Prior to the Merger, Alpine was a research and development company that had been co-founded in 2014 by Defendants Steiner and Fisch. Prior to the Merger, Defendant Steiner had been CEO and President of Alpine, and he ultimately became CEO of the combined entity.

100. On July 31, 2017, the Company formally changed the name it trades under from "The Female Health Company" to "Veru Inc." The new name also reflected the new focus of the combined company: developing and commercializing biopharmaceutical products.

**B. Veru's Shift in Focus to Research and Development**

101. When the Merger occurred, Alpine had a pipeline of five pharmaceutical therapies in development, almost all of which were in early phases, with no products having yet been put on the market. The purpose of these therapies was for treatment of oncological and urological conditions.

102. Since all the therapies in Alpine's pipeline were still in development and not yet on the market, FC2 was the only meaningful revenue-generating asset for the Company. As the Company's main source of revenue, the strategy behind the Merger was to direct the cash flow generated by FC2 directly to the funding of the research and development of Alpine's drug pipeline.

103. The below table summarizes the five drugs that the Company had in its research and development pipeline. At the time of the Merger, all five were still in development and had not yet had any New Drug Applications filed with the FDA:

| | |
|---|---|
| VERU-111 (formerly APP-111) | An oral anti-tubulin targeting chemotherapy agent. At the time of the APP Merger, APP was conducting the pre-clinical studies required before initial trials in patients could begin. |
| VERU-112 (formerly APP-112) | Drug with similar chemical composition to VERU-111, which the Company considered a "backup candidate" to be developed should VERU-111 fail. |
| APP-944 | An oral drug being developed for the treatment of hot flashes in men caused by prostate cancer hormone therapies. No clinical studies had been conducted at time of APP Merger. |
| VERU-722 (formerly MSS-722) | Being developed as the first FDA-approved oral agent for the treatment of idiopathic, or unexplained, male infertility. In a Phase II clinical trial at the time of the APP Merger. |
| Tamsulosin Delayed Release Sachet ("DRS") | A granule formulation of the Tamsulosin HCI alpha blocker—the active ingredient in Flomax, a drug that was already FDA-approved—aimed to treat benign prostatic hyperplasia ("BPH") in males with difficulty swallowing Flomax capsules or tablets. The FDA agreed to an expedited regulatory pathway during the pendency of the APP Merger transaction in 2016. |

104. As such, the Company had a pipeline of products that were all undergoing expensive and time-consuming trials to gain FDA approval. Included within these trials was VERU-111. The original purpose of VERU-111 was to treat castration-resistant prostate cancer. VERU-111 is a microtubule inhibitor that binds with high affinity at the "colchicine binding site." During mitosis, the process of cell division, microtubules (tubular structures in the cell skeleton) join together, or "polymerize," to form a "mitotic spindle," which is responsible for segregating duplicated chromosomes between daughter cells. As such, microtubules are an essential component of cell division. Therefore, inhibiting microtubule activity results in cell-cycle arrest. Tubulinbinding compounds that inhibit microtubule action have been effective in the treatment of a number of cancers due to their ability to induce cell cycle arrest in cancer cells. Given this knowledge, the Company was developing VERU-111 to treat prostate cancer under the theory that the drug would inhibit the proliferation of prostate cancer cells and block the transport of the androgen receptors necessary for tumor growth.

**C. COVID-Related Telemedicine Bumps Sales of FC2 Resulting in an**

**Unsustainable Earnings Boost That Quickly and Sharply Declined**

105. FC2 has historically faced competition from external condoms, which are both less expensive and more popular. As such, the ability to monetize FC2 was highly dependent on the Company contracting with organizations and companies that would distribute it at no cost to consumers.

106. Initially, the Company got FC2 approval from the World Health Organization, allowing the Company to contract with the United Nations agencies and other public health organizations that would purchase the product in bulk to combat STIs such as AIDs globally. However, as competitor products were subsequently approved, the Company turned its focus to sales within the US, as nationally FC2 remained the sole FDA-approved internal condom.

107. The pivot to sales within the United States was aimed to take advantage of the Patient Protection and Affordable Care Act of 2010, and any regulations promulgated thereunder, which required insurance companies must guarantee coverage of eighteen "female-controlled" contraceptive methods (such as internal condoms) with no out-of-pocket cost to the insured.

108. As such, during the first investor conference call following the Merger on March 19, 2017, it was announced that the Company was transitioning FC2 into a prescription-only product within the United States. In so doing, the cost to consumers would be covered by insurance, creating demand despite the product having a low popularity.

109. This strategy initially paid off with the prescriptions quickly gaining traction. By 2020, the revenue generated from US prescriptions overtook the revenue generated from global sales, as shown below:




110. This success was mostly attributable to arrangements that had been made with "telemedicine" or "telehealth" providers. Telemedicine and telehealth providers provide medical and pharmaceutical services over the phone or internet. In short, the Company depended on the limited number of telemedicine providers who specialized in women's health and contraceptive care. These providers would offer FC2 as a "free" add-on to hormonal birth control orders. Dating back to as early as 2020, the Company's largest customers were these telehealth providers, the largest of which, an internet company called The Pill Club, accounting for 43% of the Company's net revenue in the 2021 Fiscal Year and 44% of the Company's net revenue in the 2022 Fiscal Year.

111. With the onset of the COVID-19 pandemic and resulting shelter-in-place orders, consumers began heavily relying on telehealth providers. This alone resulted in a 766% increase in telehealth encounters within the first three months of the pandemic,[3] and significantly increased

[3] *See* Shaver, Julia. "The State of Telehealth Before and After the COVID-19 Pandemic." Primary Care Vol. 49,4 (2022): 517-530. doi:10.1016/j.pop.2022.04.002.

Veru's cashflow from resulting FC2 prescriptions. This boom quickly subsided with the pandemic conditions, with the first quarter of 2022 showing demand for telehealth that was 37% lower than the 2020 peak, and most visits coming from the behavioral health sector.[4]

112. Simultaneously, regulators began scrutinizing the large quantity of FC2 that was being added as a "free" add-on at checkout of telehealth calls, or even being dispensed despite the customer not requesting it at all, and subsequently charging insurers large sums. One example was April 11, 2022, when the State of California intervened in a *qui tam* action against The Pill Club, alleging that The Pill Club had violated California law by billing the state's public insurance programs for FC2 that was prescribed in excess of actual necessity.[5]

113. As such, the surge in revenue caused by the COVID pandemic ended quickly, causing a sharp decline in the revenue attributed to FC2, and posing a serious risk to Veru's ability to continue developing its drug pipeline, including late-stage clinical trials. This decline in revenue occurred simultaneously with an uptick in research and development expenses, as shown below:

---

[4] "2022 Trends Shaping the US Economy," Trilliant Health (October 19, 2022).
[5] *The State of California, ex rel. Happy Baumann and Cindy Swintelski vs. The Pill Club Medical Group, Inc., et al.*, Case No. 34-2019-00253324. California ultimately reached a $15 million settlement with The Pill Club on February 7, 2023. *See*: https://oag.ca.gov/system/files/attachments/pressdocs/TPC%20Fully%20Executed%20Settlement%20Agreement%20%281%29.pdf (last visited September 15, 2023).




114. As an additional consequence, the Company's inability to cover research expenses with revenue caused the cash reserves to decline significantly as well, as illustrated below:




**D. Expenses Spent on Research and Development Grow Exponentially**

115. As mentioned above, simultaneously with the decline in revenue, the Company

also experienced growing research and development costs. For example, in May 2021, Defendant Greco announced that the Company incurred research and development costs of $7.5 million for the second quarter of the 2021 Fiscal Year, a year-over-year increase of $3.6 million from the second quarter of the 2020 Fiscal Year. This number would subsequently double over the next year, with research and development costs coming in at $15.5 million in the second quarter of the 2022 Fiscal Year.

116. This increase in costs was attributable to the late-stage clinical trials in Veru's research and development pipeline. Throughout the Relevant Period, the Company simultaneously conducted a number of expensive clinical trials, including, *inter alia*: the Phase 3 trial of VERU-111 for COVID treatment; Phase 2 and 3 trials of VERU-100 for treatment of advanced prostate cancer; a Phase 2 trial of zuclomiphine citrate for the treatment of hot flashes in men; a Phase 3 trial in Enbosarm for the treatment of metastatic breast cancer; a Phase 3 trial of Enbosarm + abemaciclib for the treatment of metastatic breast cancer; a Phase 2b clinical study of sabizabulin for the treatment of metastatic breast cancer; and a Phase 3 clinical study of sabizabulin for the treatment of prostate cancer.

117. The steep increase in research and development expenses can be seen below:




118. Ultimately, as a result of the increase in research and development expenses occurring simultaneously with a decrease in net revenue, the Company saw an overall decline in net income, depicted below:




**II. <u>The Company Hopes to Tap a Source of Significant Revenue by Taking Advantage of the COVID-19 Pandemic and Transitioning VERU-111 into a COVID Treatment in Hopes of Achieving EUA</u>**

**A. The Company Identifies a Potential Application of VERU-111 for COVID-Induced Acute Respiratory Distress**

119. With a decline in total income, the Company needed a new stream of revenue in order to remain afloat and maintain its research and development pipeline. As a result, the Individual Defendants asserted that VERU-111 may be a possible treatment for COVID symptoms. Specifically, the Individual Defendants felt that VERU-111 may have benefits for COVID-related acute respiratory distress.

120. This hypothesis was drawn based on Veru's prior research into VERU-111 and its effects in fighting cancer, namely through anti-inflammatory or antiviral properties of the drug. Despite being unable to identify the exact mechanisms for either of these functions, the Individual

Defendants highlighted the potential of VERU-111 to treat "cytokine storm," which occurs when the body's anti-inflammatory systems overreact, sending excess cytokines into the bloodstream and causing the potential for acute respiratory distress, a leading cause of death in COVID-19 patients. Further, because the drug was interfering with cellular activity as opposed to the virus itself, Defendants felt that the treatment would function against all virus variants.

121. The Individual Defendants hypothesized that, regarding the inflammatory responses, VERU-111 would operate using downstream anti-inflammatory action. This was similar to another drug which had been FDA-approved for treating gout, Colchicine. This hypothesis was based on VERU-111's anti-inflammatory properties, which purportedly relate to the drug's inhibition of the formation of intact microtubule structures. Essentially, the theory was that when a virus triggers an innate immune response, microtubules are critical in bringing together the components of the inflammasome—the immune system receptors that induce inflammation—which, in turn causes cytokine storm. As VERU-111 could inhibit microtubules, it could also theoretically help prevent cytokine storm and acute respiratory distress.

122. While it was known that Colchicine did not perform well against COVID-19, because VERU-111 was a different molecule with different pharmacology and a more potent inhibitor, the Individual Defendants felt that Colchicine's failure was not dispositive, and told investors as much.

123. The Individual Defendants also hypothesized that, regarding the virological response, VERU-111 may impede viral replication by inhibiting cellular functions, despite having no evidence of the drug's direct impact on viral activity. The theory was that because viruses replicate and are packaged in the cell's endoplasmic reticulum, microtubules are therefore essential for transporting the virus to and from the endoplasmic reticulum. The virus latches onto

microtubules to move within the cell to the endoplasmic reticulum where it replicates and is packaged, passes through the golgi apparatus, and then is passed to microtubules which transport it to other cells in the body. Given all of this, through inhibiting microtubule activity, VERU-111 could theoretically prevent the replication and spread of a virus within a body's system.

### B. The Federal Government's Need, Want, and Willingness to Issue EUAs to Combat the Pandemic Creates the Opportunity for the Company to Develop VERU-111 on a Shortened, Cheaper Timeline

124. COVID-19 was declared a public health emergency under Section 319 of the Public Health Service Act on January 30, 2020 by the U.S. Health and Human Services Secretary at the time. By September 6, 2023, over 770 million cases were confirmed, and almost 7 million deaths had been attributed to the disease worldwide. 103 million of these cases, and 1.1 million of these deaths, came from within the United States.

125. In order to combat the quickly spreading pandemic, the government took steps to rapidly develop and distribute COVID-19 cures or vaccines. Among these steps, the Secretary of Health and Human Services granted the FDA the authority to issue EUAs that would permit the use of medication to diagnose, treat, or prevent the spread of COVID-19. An EUA has fewer regulatory hurdles to overcome as opposed to a typical New Drug Application, allowing for faster regulatory approval.

126. Notably, an EUA allows otherwise unapproved drugs to be used in emergency situations that help treat and prevent serious and life-threatening illnesses when certain criteria are met. The FDA is only able to grant EUAs where a determination of threat has been made by the Secretary of Homeland Security, Defense, or Health and Human Services. Drugs that are considered for EUAs receive such authorization when there is demonstrable evidence that the drug "may be effective" at treating or preventing the specific disease targeted, compared to the regular

"demonstrating substantial evidence of effectiveness for the claimed indications" standard set by a regular New Drug Application.

127. When determining whether to grant an EUA for a drug, the FDA weighs the entirety of the available scientific evidence and determines that the known and potential benefits of the drug outweigh any known or potential risks. The FDA must also consider whether the drug is more useful than currently available treatments to see if the new drug fills an unmet need.

128. Given the unique opportunity presented by the pandemic to acquire EUA, removing a number of hurdles presented by certain regulatory requirements and therefore providing a fast track to generating the cash desperately needed, as well as the theories hypothesized by the Company's researchers, the Individual Defendants elected to devote significant effort and resources towards seizing the opportunity to develop VERU-111 for COVID-19.

### C. The Company Conducts Phase 2 Trials for VERU-111 Prior to the Start of the Relevant Period

129. On May 13, 2020, it was announced that the Company received permission from the FDA to start a Phase 2 trial to study the quality and safety of VERU-111 as it relates to treatment of COVID-19. The Phase 2 study was meant to investigate the use of VERU-111 as a treatment of hospitalized adults with moderate to severe COVID-19 and were at a high risk of acute respiratory distress.

130. The Phase 2 trial was designed as a 1:1 randomized, double-blind, parallel-group, placebo-controlled study. The trial would evaluate the effect of 18 milligrams of sabizabulin (either through oral capsule or nasogastric tube) in the cohort who were given treatment daily for up to 21 days, with an additional safety follow-up prior to day 60. These results would then be compared to those who were given placebos. The study endpoint was "60-day all-cause mortality,"

i.e., whether the patient survived to day 60. The Phase 2 trial consisted of 39 subjects (19 who received the drug, and 20 who received a placebo).

131. The Company announced the enrollment of the first patient in the study on June 19, 2020. The final day of the study was December 18, 2020, when all 39 patients enrolled reached day 60 of the trial. On February 8, 2021, the Company announced the results of the study, stating that it showed a statistically significant 82% reduction in mortality versus placebo with no treatment-related adverse events.

## III. <u>The Phase 3 Trials Commenced</u>

### A. Low on Funds, the Phase 3 Trial is Repeatedly Shrunken, Despite FDA Objection

132. The same day the Phase 2 results were announced, the Company also announced a meeting with the FDA to discuss the Phase 3 trial design, with an anticipated first dose in April 2021. On an investor call that same day, Defendant Steiner stated that the expected specifications for the Phase 3 trial would be 200 hospitalized patients, with a 1:1 randomized, double-blind study. Under this design, approximately 100 patients would receive VERU-111 and 100 patients would receive a placebo.

133. Counter to these specifications, on March 1, 2021, it was announced that the FDA had agreed that the Phase 3 trial would proceed, with FDA collaboration, and consist of 400 hospitalized patients (double the 200 benchmark asserted earlier), with a 2:1 drug to placebo ration, meaning that approximately 267 patients would receive VERU-111 and 133 would receive a placebo.

134. The next update on the Phase 3 trial came on May 12, 2021, when it was announced that the FDA agreed to reduce the target enrollment to 300 patients, a 25% decrease, and that enrollment was set to begin within the next week. Under the new design, 200 patients would

receive VERU-111 and 100 patients would receive a placebo.

135. With quickly diminishing cash assets, on March 22, 2022, the Company again decreased the total trial population, cutting approximately 30% and going from 300 to 210. This new design retained the two-to-one ratio, meaning 140 patients receive the treatment, while 70 receive the placebo. In explaining the change to the FDA the following week, the Company claimed slow enrollment.

136. According to Dr. Gary Barnette, the Company's Chief Scientific Officer, the reduction of the Phase 3 trial population was actually a "business decision" that was made "as an organization," as the Company felt that it had to "make [a] decision earlier" about the drug, and in turn needed the study to conclude quickly.

137. This is also evident in that, on March 22, 2022, the trial design was altered significantly to increase the likelihood the Phase 3 trial could be terminated early. The trial utilized an O'Brien-Fleming group sequential design, which allows for interim analyses and for early termination for "clear evidence of benefit" if prespecified results are observed. This specific design's statistical "p-value" thresholds for early termination move as trials progress. At early stages—when the sample size of participants who have completed the trial is proportionally smaller compared with total planned enrollment—the criteria for termination are more stringent, requiring smaller p-values. Conversely, as the proportion of participants who have completed a trial relative to the total planned enrollment increases, the criteria for stopping an OBF trial become more lenient and allow for higher p-values.

138. The trial design allowed for a single interim analysis, scheduled to occur when 150 participants reached Day 60 of the study. Under the original design, this analysis would have occurred with data from 150 of 300 participants (50%) and required a p-value of no greater than

.003, meaning a less than 3 in 1,000 chance of mortality benefit at day 60 was random. The reduction to 210 participants meant that 72% of the study was complete, and the new study would allow an increase in p-value to .016, or a 1 in 160 chance that the mortality benefit was random. Given this, there was a significant increase in the ability to end the trial early once the trial size was increased.

139. 150 participants in the Phase 3 trial reached day 60 on April 8, 2022, triggering the interim analysis by an independent data monitoring committee. In assessing the mortality at day 60 rate, the committee found that VERU-111 and standard-of-care treatment demonstrated a statistically significant 24.9% absolute reduction and a 55.2% relative reduction in patient deaths by day 60 compared with standard-of-care treatment alone, with a p-value equaling 0.0042—falling below the .016 threshold dictated by the OBF design for an interim assessment of 72% of the total target population. Given these results, the committee recommended the study be terminated.

140. Notably however, had there not been a reduction in study size on March 22, 2022, the required p-value would have had to have been below .003 to recommend early termination. With an actual p-value of .0042 at the interim, the test would have failed to meet this threshold, and the study would have continued. Despite this, the Company terminated the trial.

141. On the date of termination, April 8, 2022, there were 204 enrolled participants in the Phase 3 trial. While all enrolled participants were entitled to complete the study, the Company neglected to enroll the final 6 patients necessary to reach 210. As such, Veru's Phase 3 trial was the smallest pivotal trial ever submitted to the FDA for EUA related to treatment of COVID-19. With only 204 participants, the Phase 3 trial was approximately half the size of the smallest trial that resulted in an EUA having been granted. As shown below, even if the Company had

maintained the 300-participant trial, it still would have been smaller than any that received EUA:




### B. Because of the Reduction in the Company's Trial Size, the Results Were Unreliable

142. As a result of the diminished sample size of the Phase 3 trial, there was significant concern that the results could not accurately be conclusive for the entire population. Regardless of whether the FDA is considering a New Drug Application or EUA, the FDA looks to both the drug's efficacy and its safety profile as part of the risk-benefit analysis. Where there is a small sample size, as there was here, there is a hindered analysis of both numbers.

143. From the outset, the data was too limited to properly apply an accurate characterization of the drug's safety profile. The Phase 3 trial fully monitored 130 patients total in the treatment group. Of these, 82% stopped treatment before the fully prescribed 21 days, with a mean exposure duration of 9.1 days. Given this, it was impossible to use the data to predict rare adverse events. Even further, the small size hindered assessment of the likelihood and potential

implications of common, clinically related adverse events observed in the data set – including UTIs, gastrointestinal hemorrhages, anemia, and deep vein thrombosis – all of which can have serious repercussions in critically ill populations generally, let alone in COVID-19 patients.

144. Even more worrisome, the treatment and placebo groups had certain baseline imbalances with clinical relevance. The small sample size emphasized the impact of these imbalances between the study arms, calling into question the veracity of the drug's observed efficacy. The below table shows the Phase 3 trial imbalances that were suffered with respect to each of the key criteria enumerated below that were likely to impact COVID-19 prognosis and mortality:

| **Criteria** | **Treatment Arm** | **Placebo Arm** |
|---|---|---|
| Subjects Aged 65+ | 50% | 58.6% |
| Subjects in ICU at Baseline | 38.1% | 44.3% |
| Greater than 14 days of Standard of Care Prior to Randomization | 6.7% | 0% |
| *Standard of Care Received* | | |
| Remdesivir | 29.9% | 24.3% |
| Dexamethasone | 80.6% | 77.1% |
| *Comorbidities* | | |
| Diabetes | 33.6% | 40% |
| Hypertension | 63.4% | 65.7% |
| Pneumonia | 60.4% | 65.7% |
| Acute Respiratory Failure | 20.9% | 25.7% |
| Acute Respiratory Distress Syndrome | 2.2% | 4.3% |

| | | |
|---|---|---|
| Subjects with **NO** Comorbidities | 16.4% | 12.9% |

145. As the FDA would ultimately observe, the above inconsistencies from the outset were significant. Age was one of the single biggest risk factors for severe COVID-19 infection. As such, the high proportion of subjects aged 65 and over in the placebo group could have yielded significantly impacted results. Additionally, the inconsistencies between the standard of care prior to treatment were also impactful. Any patient who took part in the trial would have had compelling reasons to have taken remdesivir and dexamethasone under the U.S. standard of care, however the percentage of patients receiving these treatments was lower in the placebo group than the treatment group. Further, the FDA went on to observe that one of the most helpful indicators of baseline severity is the number of patients who were in the ICU at outset, with this data set having a greater than 6% difference between the two groups. Lastly, the co-morbidities listed in the table above are each significant mortality risk factors in COVID-19.[6]

146. As a result of the small sample size and the 2:1 randomization ratio, imbalances impacting even a small amount of patients have the ability to fundamentally impact the final conclusions drawn from the data, and any controls that were built into the efficacy model may not fully account for such imbalances. As would later be explained by the FDA, in a hypothetical scenario in which death outcomes for even four patients in the treatment arm were changed from alive to not alive, the statistical significance of the results at the 0.05 confidence interval would be eliminated. Further, even assuming these baseline inconsistencies were innocent externality of a limited sample, the overall clinical impact of the inconsistencies in this small a study could still be impactful.

[6] Djaharuddin, Irawaty et al. "Comorbidities and mortality in COVID-19 patients." Gaceta sanitaria vol. 35 Suppl 2 (2021): S530-S532. doi:10.1016/j.gaceta.2021.10.085.

147. The data that was actually collected in the Phase 3 trial appears to bolster the notion that the inconsistencies between the treatment and control groups likely did influence the results. The mortality rate that was observed at Day 60 in the placebo group was high: 45.1% at the interim analysis, and 39.7% in the overall 204-person sample. These numbers greatly surpassed mortality rates in similar populations in prior and concurrent studies. In five prior and concurrent studies conducted by the FDA, the placebo mortality rates were 15%, 25%, 11%, 16.5%, and 35%, respectively – all of which fall below the rates of the Phase 3 trial. As such, the limited trial size caused the inconsistencies between the trial groups to cast doubt on the accuracy of the study's overall efficacy and safety data.

**False and Misleading Statements**

***March 1, 2021 Press Release***

148. On March 1, 2021, the Company issued the Phase 3 Approval Press Release, titled "Veru Received FDA Agreement to Advance VERU-111 into Phase 3 Study in Hospitalized COVID-19 Patients at High Risk for Acute Respiratory Distress Syndrome (ARDS)." The Phase 3 Approval Press Release announced the Company had met with the FDA about the Phase 3 trial and the FDA had "agreed" to the Company's trial design, stating:

> Veru Inc. … today announced that the FDA agreed in an End of Phase 2 meeting, to advance VERU-111 into a Phase 3 registrational clinical study based on clinically meaningful benefits observed with VERU-111 treatment in the recently completed double-blind, randomized, placebo-controlled Phase 2 clinical trial evaluating oral, once-a-day dosing of VERU-111 versus placebo in approximately 40 hospitalized COVID-19 patients at high risk of ARDS ….
>
> "We are very pleased with the outcome of the FDA meeting. FDA was extremely collaborative and thought that the clinical data from the Phase 2 were promising and suggest a potential clinically meaningful benefit for the use of VERU-111 warrants further development in a Phase 3 program," said Mitchell Steiner, M.D., Chairman, President and Chief Executive Officer of Veru ….
>
> With a similar trial design to the completed positive Phase 2 study, the Phase 3

> clinical registration trial design will evaluate daily oral doses of VERU-111 versus placebo with the primary efficacy endpoint of proportion of patients alive at Day 29. ***It is expected that the Phase 3 clinical trial will be conducted in approximately 400 hospitalized who have SARS-CoV-2 virus infection and are at high risk for ARDS at a 2:1 ratio between the VERU-111 (approximately 267 patients) and placebo (approximately 133 patients) treated groups***.

***May 12, 2021 Earnings Call***

149. On May 12, 2021, before the market opened, the Company held an earnings call with investors to discuss the financial results for the second quarter of the 2021 Fiscal Year (the "2Q 2021 Earnings Call"). On the 2Q 2021 Earnings Call, Defendant Steiner discussed the FDA approval of the Company's Phase 3 trial design, stating:

> The company was granted an expedited end of Phase 2 meeting with FDA to discuss the next steps, including the Phase 3 clinical registration trial design for sabizabulin COVID-19 program. ***The FDA agreed upon sabizabulin for the COVID-19 Phase 3 trial as a double-blind, multi-center, multinational randomized 2:1 placebo-controlled trial, evaluating daily oral doses of 9-milligrams of sabizabulin for up to 21 days versus placebo in 300 hospitalized COVID-19 patients, who had high risk for ARDS.*** There will be 200 subjects who will be treated with sabizabulin and 100 subjects who will receive placebo.

***May 11, 2022 Press Release***

150. On May 11, 2022, before the market opened, the Company issued a press release announcing the outcome of a meeting held with the FDA on the day prior (the "End of Trial Press Release"), titled "FDA States that Veru Should Submit Request for Emergency Use Authorization (EUA) Based on Positive Efficacy and Safety Data from the Phase 3 Clinical Study of Sabizabulin in Hospitalized COVID-19 Patients."

151. The End of Trial Press Release announced that the FDA "agreed" the Phase 3 Trial was sufficient to meet both the efficacy and safety requirements for an EUA. Additionally, the End of Trial Press Release announced that the efficacy data would be sufficient to support a full New Drug Application, and "No Additional Efficacy Studies or Safety Data are Required to Support a

Request for EUA." More broadly, the press release stated:

> ***FDA has agreed that the efficacy and safety data from the completed Phase 3 clinical study in hospitalized COVID-19 patients at high risk for acute respiratory distress syndrome are sufficient to support the submission of a request for Emergency Use Authorization (EUA).***
>
> * * *
>
> FDA agreed that the Phase 3 COVID-19 study that was stopped by the Independent Data Monitoring Committee for overwhelming efficacy ***is sufficient to support the efficacy portion of a request for EUA submission and for an NDA submission.***
>
> FDA agreed that the current safety data available for sabizabulin is sufficient to support the safety portion of a request for EUA submission. FDA informed the Company that additional safety data that would be collected during the use of sabizabulin under the EUA, if granted, will be sufficient to support an NDA submission, and furthermore, that no additional safety clinical studies are required.

152. The FDA Update Press Release also quoted Defendant Steiner, who stated:

> ***The discussion with FDA in the Pre-EUA meeting has established a direct path forward to expedite the availability of sabizabulin to the high risk hospitalized patients with COVID-19***. … In the Phase 3 COVID-19 clinical study, sabizabulin demonstrated a clear mortality benefit in hospitalized moderate to severe COVID19 patients on current standard of care with no significant safety signals.

***May 12, 2022 Press Release***

153. On May 12, 2022, before the market opened, the Company issued a press release announcing the financial results for the second quarter of the 2022 Fiscal Year (the "2Q 2022 Press Release"), titled "Veru Reports Second Quarter Fiscal 2022 Results and Progress of Sabizabulin for COVID-19 Toward a Request for Emergency Use Authorization."

154. The 2Q 2022 Press Release again announced that the FDA had "agreed" the Phase 3 trial was "sufficient to support the efficacy portion of a request for EUA submission and for an NDA submission." The 2Q 2022 Press Release further stated:

> ***FDA also agreed that the current safety data available for sabizabulin is sufficient to support the safety portion of a request for EUA submission***. FDA informed the Company that additional safety data that would be collected during

> the use of sabizabulin under the EUA, if granted, will be sufficient to support an NDA submission, and furthermore, that no additional safety clinical studies are required.

155. Later in the 2Q 2022 Press Release, Defendant Steiner was quoted, stating the following, in relevant part:

> "Following a positive Phase 3 COVID-19 clinical study where sabizabulin treatment resulted in a clear clinical benefit by significantly reducing deaths, we met with FDA for a Pre-EUA meeting on May 10, 2022. ***FDA agreed that our development program had sufficient efficacy and safety data to support a request for EUA application. No additional efficacy or safety studies will be required***," said Mitchell Steiner, M.D., Chairman, President and Chief Executive Officer of Veru Inc. "The Agency has been incredibly responsive, and we look forward to submitting a request for Emergency Use Authorization application as soon as possible. The high mortality rates observed in hospitalized moderate to severe COVID-19 patients in the placebo group underscores that this remains a high unmet medical need. We look forward to updating you as we advance sabizabulin to these high-risk patients."

***May 12, 2022 10-Q***

156. On May 12, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2022 (the "2Q 2022 10-Q"), which was signed by Defendants Steiner and Greco. Attached to the 2Q 2022 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Steiner and Greco attesting to the accuracy of financial reporting, the disclosure of all fraud, and the disclosure of any material changes to Veru's internal control over financial reporting.

157. The 2Q 2022 10-Q reported the FDA "agreed" that the Phase 3 trial design and execution provided the appropriate efficacy and safety data for a full New Drug Application, let alone an EUA. Specifically, the 2Q 2022 10-Q stated:

> On May 10, 2022, the Company had a pre-Emergency Use Authorization (EUA) meeting with the FDA to discuss next steps including the submission of an EUA application regarding sabizabulin for COVID-19. The outcome of this meeting was:

> (i) ***the FDA agreed that no additional efficacy studies were required to support an EUA application or a new drug application (NDA); and (ii) the FDA agreed that no additional safety data was required to support an EUA application and that collection of safety data under the EUA will satisfy the safety requirement for an NDA.*** The FDA agreed that the request for the EUA is supported by efficacy and safety from our positive Phase 3 COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and death and no additional clinical trials are required to support an NDA submission. We plan to submit the EUA application in the second quarter of calendar year 2022.

158. The 2Q 2022 10-Q also listed risk factors that suggested the FDA merely "may" request additional trial data. Specifically, the 2Q 2022 10-Q stated, despite the fact "the EUA process is designed to enable more expeditious marketing of a drug in response to a public health emergency, ***FDA review of an EUA application may take longer than expected and may result in the FDA requesting additional data or other information that may have the effect of delaying the EUA***."

***May 12, 2022 Earnings Call***

159. That same day, the Company hosted an earnings call with investors and analysts to discuss the second quarter financial results of the 2022 Fiscal Year (the "2Q 2022 Earnings Call"). On the 2Q 2022 Earnings Call, Defendant Steiner discussed the supposed FDA approval of the Phase 3 trial design, stating:

> We had a pre-emergency use authorization meeting with FDA on May 10 to discuss the next steps, including the submission of an emergency use authorization application. The outcome of this meeting is as follows. ***FDA agrees that no additional efficacy studies are required to support an EUA or a full NDA. FDA agreed that no additional safety data required to support an EUA and collection of safety data under the EUA will satisfy the safety requirement for a full NDA. Therefore, FDA agreed that the request for EUA is supported by efficacy and safety data from our positive Phase III COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and no additional clinical studies are required to support an NDA submission.***

160. In discussing criticisms received about the Phase 3 trial, Defendant Steiner stated:

> ***Concern #4, there is a high risk that the FDA will not accept an EUA application***

> ***because our Phase III study was too small. Not true***. As we have previously reported, we've had a pre-EUA meeting with FDA on May 10, 2022.
>
> ***FDA agreed that no additional efficacy studies are required to support an EUA or an NDA. FDA agreed that no additional safety data required to support an EUA and the collection of safety data under the EUA will satisfy the safety requirement for an NDA. Therefore, FDA agreed that the request for EUA is supported by efficacy and safety data from our positive Phase III COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and no additional clinical trials are required to support an NDA submission***. Short sellers might like to lob unfounded criticisms, but our audience is the FDA who helped develop the study design and who have now told us that the data are sufficient to proceed. As patients are waiting, we will work diligently to prepare and to submit the EUA application ***now that we've received the green light and encouragement to do so from FDA***.

***August 11, 2022 10-Q***

161. On August 11, 2022, before the market opened, Veru filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2022 (the "3Q 2022 10-Q"), which was signed by Defendants Steiner and Greco. Attached to the 3Q 2022 10-Q were SOX certifications signed by Defendants Steiner and Greco attesting to the accuracy of financial reporting, the disclosure of all fraud, and the disclosure of any material changes to Veru's internal control over financial reporting.

162. The 3Q 2022 10-Q contained similar statements as the 2Q 2022 10-Q regarding the FDA's approval of the Phase 3 trial design and execution. Specifically, the 3Q 2022 10-Q stated:

> On May 10, 2022, the Company had a pre-Emergency Use Authorization (EUA) meeting with the FDA to discuss next steps including the submission of an EUA application regarding sabizabulin for COVID-19. The outcome of this meeting was: (i) ***the FDA agreed that no additional efficacy studies were required to support an EUA application or a new drug application (NDA); and (ii) the FDA agreed that no additional safety data was required to support an EUA application and that collection of safety data under the EUA will satisfy the safety requirement for an NDA. The FDA agreed that the request for the EUA is supported by efficacy and safety from our positive Phase 3 COVID-19 study in hospitalized***

***moderate to severe COVID-19 patients who are at high risk for ARDS and death and no additional clinical trials are required to support an NDA submission***

163. The 3Q 2022 10-Q further stated the following with respect to additional risk factors, "[a]lthough the EUA process is designed to enable more expeditious marketing of a drug in response to a public health emergency, ***FDA review of an EUA application may take longer than expected and may result in the FDA requesting additional data or other information that may have the effect of delaying the EUA***."

164. The aforementioned statements in ¶¶148-163 were materially false and misleading and failed to disclose, *inter alia*, that: (1) the FDA had "repeatedly" warned the Company against using a test group smaller than 500 participants for the Phase 3 trial; (2) the FDA also warned against using a 2:1 randomization ratio in the Phase 3 trial; (3) despite these warnings, Veru's Phase 3 trial group consisted of 300 participants in a 2:1 randomization ration; (4) the FDA further advised against the shrinking of the test group to 210 participants; (5) despite these warnings, the Company shrunk the test group to 210 participants; (6) as a result of failing to heed these warnings and recommendations, VERU-111 was at high risk of not receiving its EUA; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, Defendants' statements were materially false and misleading at all relevant times.

## THE TRUTH EMERGES

### *The November 9, 2022 Pulmonary-Allergy Drugs Advisory Committee Meeting*

165. The truth began to emerge on November 9, 2022, when the Company presented to the FDA's Pulmonary-Allergy Drugs Advisory Committee ("PADAC"). The meeting with PADAC was recorded on YouTube and the transcript was published on the FDA's website.

166. Throughout the PADAC meeting, it became apparent that the Individual Defendants had misled investors when representing that the FDA and Company were in agreement

on how to conduct the Phase 3 trial. For example, FDA Medical Officer Dr. Robert Busch revealed to the public that the FDA had "***highlighted repeatedly that the size of the safety database was small compared to other products which had been granted EUA***," and that the FDA "proposed that ***at least 500 subjects treated with -111 would provide a more robust characterization of both effectiveness and safety in the context of a possible clinical benefit and any potential safety concern observed***." Despite these warnings, Dr. Busch also informed the committee (and the public) that "during the conduct of [the Phase 3 trial], the [Company] proposed a sample size change from 300 down to 210 subjects, as they've noted, citing slow enrollment. This was followed by an interim analysis that suggested efficacy on the all-cause mortality endpoint, based on an analysis of the first 150 subjects." In short, Dr. Busch revealed that the FDA "did make clear to the [Company], a few times, we would expect 500 subjects."

167. Dr. Busch further revealed that in addition to the size concerns, the FDA had advised against the Company using the "2 to 1 randomization ration" as the small placebo group had the opportunity to undermine the significance of the trial data. As Dr. Busch advised the voting members of the committee:

> *Susanne May, M.D.*
> So maybe it's not only discussion, but if there is another question to the FDA here, it is, ***when this study was started, some of the concerns that are still raised now could have been anticipated before it was started***, and what would the agency have wanted to see differently for this study to not bring this to the advisory committee but be convinced and go ahead with the emergency use authorization? And that's my comment and question.
>
> *Robert Busch, M.D., MMSc*
> So we did mention -- find my slide – during the presentation that ***communications between the division and the sponsor highlighted repeatedly that the size of the safety database was small compared to other products which had been granted the EUA, and that the division proposed that at least 500 subjects treated with Veru-111 would provide a more robust characterization of both effectiveness and safety.***
>
> I think that during the pandemic, there are certain things that we have power to regulate and certain things that we do not. If a sponsor proposes a study where the sample size is not ideal for our purposes, that may not be a reason to stop the trial.

> ***We can give advice, but we can't force that issue***. I think that we had an expectation that there might be another trial.
>
> ***In addition, I think it's important to note that we also cautioned against the 2 to 1 randomization ratio. Again, we may have expected a bigger study to begin with, and we didn't necessarily expect the sample size to go down further.***
>
> In all this context, again, we are somewhat limited in the power of what we can do, and we didn't want to shut down research during the pandemic if it seemed notable. We have to acknowledge, though, too, the reason this is at an advisory committee with so few subjects is because of the point estimate. I don't think there was a way for us to predict -- again, as the sponsor presenter said, "I've never seen a risk difference --" again, we keep coming back to that. We might have expected that we would have another trial.
>
> We might have expected that we would have more people in the trial along the way before the sample size changed. ***But we did make clear to the sponsor, a few times, we would expect 500 subjects***. So that's a reasonable discussion of where our expectations stood in the context of a pandemic.

168. Upon the conclusion of the meeting, eight of the thirteen voting members of the committee voted "No" to the question, ""Do the known and potential benefits of VERU-111, when used for the treatment of adult patients hospitalized with COVID-19 at high risk of ARDS, outweigh the known and potential risks of Veru-111?" Worse yet, all eight "No" votes stated the sample size of the Phase 3 trial was too small and/or they would have needed to see a larger sample size.

169. On this news, the price of the Company's common stock fell $8.04 per share, or approximately 53.6%, from a closing price of $15.01 per share on November 9, 2022, to close at $6.97 per share on November 10, 2022.

***February 24, 2023 FDA Denial***

170. On February 24, 2023, the FDA sent a report to Veru officially rejecting the EUA for VERU-111, titled "Declination of Emergency Use Authorization for sabizabulin 9mg Capsules" (the "Rejection Report"). The Rejection Report explained the FDA's decision, citing

how the FDA had told the Company not to reduce the Phase 3 trial sample group. The Rejection Report also made clear that, throughout the Relevant Period, the Individual Defendants were aware of and withheld this information from the public, stating:

> To support the sample size reduction to 210 subjects (140 subjects in the Veru-111 treated group and 70 subjects in the placebo treated group), the Sponsor cited calculations based on assumptions from the Phase 2 study….***The Agency continued to caution against this change, noting that there was considerable uncertainty in the Phase 2 study results relied upon for these calculations. The Agency also raised concerns regarding whether the resulting limited safety database would be sufficient to characterize the known and potential risks associated with Veru-111. However, the Sponsor moved forward with this reduction***.

***March 2, 2023 Press Release***

171. On March 2, 2023, after the market closed, the Company issued a press release announcing the FDA rejected the EUA for VERU-111 in treating COVID-19 (the "FDA Rejection Press Release"). The FDA Rejection Press Release stated:

> Veru Inc. (NASDAQ: Veru), a biopharmaceutical company focused on developing novel medicines for COVID-19 and other viral ARDS-related diseases and for oncology, today announced that the U.S. Food and Drug Administration (FDA) has declined to grant at this time the Company's request for Emergency Use Authorization (EUA) for sabizabulin, Veru's novel microtubule disruptor, to treat hospitalized adult patients with moderate to severe COVID-19 who are at high risk for Acute Respiratory Distress Syndrome (ARDS).

172. On this news, the price of the Company's common stock fell $1.36 per share, or approximately 36.0%, from a closing price of $3.78 per share on March 2, 2023, to close at $2.42 per share on March 3, 2023.

## DAMAGES TO VERU

173. As a direct and proximate result of the Individual Defendants' conduct, Veru will lose and expend many millions of dollars.

174. Such expenditures include, but are not limited to, legal fees associated with the

Securities Class Action and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

175. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

176. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

177. Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

178. As a direct and proximate result of the Individual Defendants' conduct, Veru has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

179. Plaintiff brings this action derivatively in the right and for the benefit of Veru to redress injuries suffered, and to be suffered, by Veru as a direct result of breaches of fiduciary duty by the Individual Defendants, waste of corporate assets, and unjust enrichment, as well as for contribution for violations of Section 10(b) of the Exchange Act. Veru is named as a nominal

defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

180. Plaintiff will adequately and fairly represent the interests of Veru in enforcing and prosecuting its rights.

181. Plaintiff has continuously been a shareholder of Veru at times relevant to the wrongdoing complained of and is a current Veru shareholder.

**DEMAND REFUSAL ALLEGATIONS**

182. On February 2, 2024, consistent with Wisconsin law, Plaintiff served a pre-suit Litigation Demand on the Board, attached hereto as Exhibit A. Plaintiff demanded the Board investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for mismanagement and breaches of fiduciary duties.

183. Plaintiff also demanded that the Board reform and improve its corporate governance and internal procedures to comply with all applicable laws and to protect Veru from committing future wrongful or wasteful acts. Specifically, Plaintiff demanded that the Board, *inter alia*: (i) commence a civil action against each responsible individual to recover for the benefit of the Company; (ii) assess whether any third parties should be sued, such as Veru's financial advisors, auditors, or attorneys; (iii) adopt corporate governance improvements for Veru immediately.

184. Exactly three months later, on May 2, 2024, Brian Miller, an attorney for Veru, acknowledged the Company's receipt of the Litigation Demand and stated that:

> the bases of your demand are already the subject of a pending securities class action…[t]he issues to be litigated [in the Securities Class Action] would have an effect on the factual and legal predicate for your demand. As such, and given the underlying issues being litigation…your demand is neither refused nor rejected. Rather the Board will consider your demand once that case has concluded, and will respond appropriately in due course.

*See* Exhibit B.

185. On June 26, 2024, having received no further correspondence from the Board, Plaintiff sent a letter to Mr. Miller communicating that the Board had not yet provided an adequate response to the Litigation Demand, as it was required to, but rather appeared to be seeking to stay its obligations under Wisconsin law. Plaintiff signaled that an indefinite delay could amount to a constructive refusal and that such indefinite delay has been found in other courts to be outside the best interests of the company and an improper deferral of the Board's duty to investigate. Seeking to protect the Company's interests and potential claims, Plaintiff proposed in that letter a set of terms that he would be willing to stay the Litigation Demand in favor of, including an agreement by the Board to secure appropriate tolling agreements from the individual identified in the Litigation Demand. Plaintiff requested the Board to respond within a week.

186. The Board ignored that letter until August 7, 2024, after Plaintiff again reached out to Mr. Miller over email requesting the Board to provide a substantive response. The same day, Mr. Miller responded rejecting Plaintiff's proposed terms and any stay.

187. Over the course of the last several months, the Board made clear that it is unwilling to take any actions in connection with the Litigation Demand, including to reform or improve the Company's corporate governance and internal procedures. Neither has the Board taken or provided any reassurance that it would take any appropriate action to secure tolling agreements despite multiple months passing since receiving the Litigation Demand. Accordingly, the Company remains exposed to additional harm from the wrongful conduct described herein and is not protected against the running of the statute of limitations. As it stands, the Board instead determined to indefinitely defer any consideration of the Litigation Demand, exposing the Company to continued harm. Therefore, Plaintiff's Litigation Demand was wrongfully refused,

and Plaintiff brings this action to prevent irreparable harm to the Company.

188. The Board has utterly failed to take the Litigation Demand seriously and refused to take any proactive measures to consider the Litigation Demand, such as by forming a committee. Their deliberate failure to act is a constructive refusal that is wrongful. Wisconsin law requires, at a minimum, for a Board to investigate and provide a substantive response to a formal litigation demand pursuant to Wis. Stat. § 180.0742. The Board had a generous 90-day period to at the very least preliminarily consider a demand before a plaintiff is entitled to a response or to initiate an action if the Board ignores the demand to the company's detriment or rejects it. Here, the Board willfully abandoned this responsibility in favor of related litigation that could proceed for years. The existence of a related lawsuit is not a sufficient basis to entirely forgo any investigation or response whatsoever to a demand. The Board's failure to timely act on plaintiff's demand was not an objective decision reached with due care, as the Board did not act independently, reasonably, nor in good faith, on the basis of all reasonably available information Rather, the Board has disregarded the merits of the claims and allegations. Accordingly, the Board wrongfully refused plaintiff's demand.

189. The Board's decision-making to date is not consistent with its obligation to determine in good faith whether the demand's claims have merit and whether it would be in the Company's best interests to pursue them. At no point did the Board discuss any measures taken to address the underlying allegations, deny the merits of such allegations, or indicate that the Board considered whether corporate governance improvements were warranted before constructively rejecting the Litigation Demand. To date, Plaintiff is not aware of any action taken by Veru against the Individual Defendants to mitigate the significant harm that has been wrought upon the Company through their misconduct. Thus, to date, Veru remains exposed to continued misconduct

and damages. At the same time, the Board is causing the Company to continue to shoulder the costs of defending the underlying wrongdoers as the damages to Veru only climb. Furthermore, because the Board has determined to defer any inquiry of the Litigation Demand for an indeterminate period, the underlying claims may face applicable statute of limitations concerns, which the Board has made no mitigative efforts in connection with. None of these actions could reasonably be considered to have been taken in the Company's best interests. As such, the Board has violated Wisconsin law by indefinitely delaying its consideration of the Litigation Demand and failing to provide Plaintiff with a response within a reasonable period of time. As a result, the Litigation Demand was wrongfully refused and Plaintiff is entitled under Wisconsin law to pursue the claims pled herein for the benefit of the Company.

## FIRST CLAIM
## Against the Individual Defendants for Breach of Fiduciary Duties

190. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Veru's business and affairs.

192. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

193. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Veru.

194. In breach of their fiduciary duties owed to Veru, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements

and omissions of material fact which failed to disclose, *inter alia*, that: (1) the FDA had "repeatedly" warned the Company against using a test group smaller than 500 participants for the Phase 3 trial; (2) the FDA also warned against using a 2:1 randomization ratio in the Phase 3 trial; (3) despite these warnings, Veru's Phase 3 trial group consisted of 300 participants in a 2:1 randomization ration; (4) the FDA further advised against the shrinking of the test group to 210 participants; (5) despite these warnings, the Company shrunk the test group to 210 participants; (6) as a result of failing to heed these warnings and recommendations, VERU-111 was at high risk of not receiving its EUA; and (7) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

195. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

196. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

197. In yet further breach of their fiduciary duties, during the Relevant Period, two of Individual Defendants engaged in lucrative insider sales of the Company's common stock at artificially inflated prices before the fraud was exposed, netting proceeds of approximately $2.8 million.

198. The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct

the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

199. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

200. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Veru has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201. Plaintiff, on behalf of Veru, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

202. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Veru.

204. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Veru that was tied to the performance or artificially inflated valuation of Veru or received compensation or other payments

that were unjust in light of the Individual Defendants' bad faith conduct.

205. Plaintiff, as a shareholder and representative of Veru, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

206. Plaintiff, on behalf of Veru, has no adequate remedy at law.

## FIFTH CLAIM
## Against the Individual Defendants for Abuse of Control

207. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Veru, for which they are legally responsible.

209. As a direct and proximate result of the Individual Defendants' abuse of control, Veru has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

210. Plaintiff, on behalf of Veru, has no adequate remedy at law.

## SIXTH CLAIM
## Against the Individual Defendants for Gross Mismanagement

211. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

212. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Veru in a manner consistent with the operations of a publicly held corporation.

213. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Veru has sustained and will continue to sustain significant damages.

214. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

215. Plaintiff, on behalf of Veru, has no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

218. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

219. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

220. Plaintiff, on behalf of Veru, has no adequate remedy at law.

**EIGHTH CLAIM**
**Against Defendants Steiner and Greco for Contribution Under Sections 10(b) and 21D of the Exchange Act**

221. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222. Veru and Defendants Steiner and Greco are named as defendants in the Securities

Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Steiners and Greco's willful and/or reckless violations of their obligations as officers, directors, and/or former officers of Veru.

223. Defendants Steiner and Greco, because of their positions of control and authority as officers, directors, and/or former officers of Veru, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Veru, including the wrongful acts complained of herein and in the Securities Class Action.

224. Accordingly, Defendants Steiner and Greco are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

225. As such, Veru is entitled to receive all appropriate contribution or indemnification from Defendants Steiner and Greco.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Veru, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Veru;

(c) Determining and awarding to Veru the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Veru and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Veru and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Veru to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Veru restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, June Ovadias, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29__ day of September, 2024.

DocuSigned by:
June Ovadias
E08EC0501A874BD...

June Ovadias